**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | **Case No. 23-cr-300 (DLF)** |
| v. | : | |
| | : | |
| RAYMOND CHAMBERS, II, | : | |
| | : | |
| Defendant | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. A jury convicted Raymond Chambers, II of four crimes: (a) Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); (b) Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); (c) Disorderly or Disruptive Conduct on the Grounds or in the Buildings of the United States Capitol, in violation of 40 U.S.C. § 5104(e)(2)(D); and (d) Parading, Demonstrating, or Picketing in any Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G). For the reasons set forth herein, the government requests that this Court sentence Chambers to 13 months' incarceration followed by twelve months' probation. The government also requests that this Court impose $500 in restitution.

## I.     Introduction

Defendant Raymond Chambers, II, a 34 year old access control specialist participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful

transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

The government's recommendation is supported by the following facts: (1) before entering the U.S. Capitol building, Chambers spent almost an hour watching chaos and violence on restricted Capitol grounds, including tear gas in the air and rioters attacking a line of police officers with a giant Trump sign (2) before entering the Capitol building, Chambers was fully aware that rioters were attacking police and attempting to breach the Capitol building on multiple sides, as he observed violence and chaos on both the West and East fronts outside of the Capitol building (3) Chambers entered the Capitol building as part of a violent mob that overwhelmed the police and caused a major breach of the building (4) Chambers celebrated entering the Capitol when he yelled, "whose house, our house" (5) Chambers advised a friend who also participated in the riot not to cooperate with the FBI; and (6) Chambers lied to the FBI and the Court about his conduct on January 6.

The Court must also consider that Chambers' conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt certification proceedings. But for

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Chambers' crime support a sentence of 13 months' incarceration in this case.

## II.      Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 1.

### *Chambers' Role in the January 6, 2021 Attack on the Capitol*

The evidence at trial showed that Chambers traveled from Virginia to Washington, D.C., on the morning of January 6, 2021 with his friend, Weston Sobotka. Sobotka pleaded guilty to a violation of 40 U.S.C. § 5104(e)(2)(G) and Judge Nichols sentenced him to 36 months' probation, 15 days intermittent confinement, and $500 in restitution. [*United States v. Weston Sobotka*, 22-cr388 (CJN)].

Chambers attended the "Stop the Steal" rally at the Ellipse with Sobotka, where he listened to President Trump's speech. Towards the end of that speech, Chambers joined the crowd walking from the Ellipse to the restricted Capitol grounds. *See* Govt. Trial Ex. 514, 515, 204.

At trial, the evidence showed that Chambers approached the Capitol from the west, entering the restricted Capitol area and reaching the West Plaza. As he approached the restricted Capitol area on the west side, he passed numerous bike racks, snow fencing, and "Area Closed" signs.



*Govt. Trial Exhibit 204 (Area closed sign and snow fencing around west side of the Capitol grounds at approximately the same time as Chambers was on the west lawn of Capitol grounds as depicted in Govt. Trial Exhibits 515, 500, 501)*

The position and condition of the displaced fencing showed that it had been pushed out of the way by other rioters, but the "Area Closed" signs on the fences were still visible. *See* Govt. Trial Ex. 501 and 515.



*Govt. Trial Exhibits 515 and 501(Area closed signs and snow fencing circled in red)*



*Govt. Trial Exhibit 516 (Chambers circled in yellow)*

As Chambers entered the West Plaza and saw the crowd of rioters, he lifted his hands up to embrace the chaos. Once on the West Plaza, Chambers was in the middle of a crowd of rioters. Police officers dressed in riot gear were holding the crowd back to prevent them from getting closer to the Capitol building. Chambers watched as officers deployed chemical irritant spray and defended themselves against the attacking rioters. Chambers also watched as the crowd of rioters obtained a large, metal framed sign with large metal casters, lifted it over their heads, and moved it toward the line of officers. *See* Govt. Trial Ex. 518. Those rioters eventually shoved that sign towards a line of officers, who were fortunately able to avoid serious injury.



*Govt. Trial Exhibit 518 (Chambers circled in red)*

After spending approximately 30 minutes on the West Plaza, Chambers walked to the east side of the building. There, he stood at the bottom of the steps leading to the East Rotunda Door as other rioters stood on police vehicles and chanted "Send out the Traitors!" *See* Govt. Trial Ex. 521.



*Govt. Trial Exhibit 521 (Chambers circled in yellow)*

Chambers ascended the steps and approached the East Rotunda door. As Chambers stood at the door's entry, he saw police officers struggling to keep the doors closed and prevent rioters from entering the building. Chambers was less than one foot away from a confrontation which the mob ripped away an officer's shield and separating him from the rest of the police officers at the door. *See* Govt. Trial Ex. 206. Throughout his approximately 40 minutes near the East Rotunda Doors, alarms blared from the building.



*Govt. Trial Exhibit 206 (Chambers circled in yellow, police officer's shield circled in green)*

A little after 3:00 PM, Chambers pushed forward and through the East Rotunda Doors as part of a mob of rioters who entered the Capitol building at that breach point. As he walked across the threshold, he tapped on the broken glass in the door and chanted "Whose house, our house" with the crowd. *See* Govt. Trial Ex. 207.



*Govt. Trial Exhibit 207 (Chambers circled in red)*

Once Chambers entered the building, he walked into the Rotunda and remained there for numerous minutes until the police were able to physically evict him through the East Rotunda Doors and out of the building. As he exited the Capitol building, Chambers was clapping in celebration. *See* Govt. Trial Ex. 210.



*Govt. Trial Exhibit 210 (Chambers circled in yellow)*

The evidence showed that shortly after leaving the restricted Capitol area, Chambers and Sobotka gave an interview. They discussed how they observed a "mob" outside the East Rotunda Doors. While there, a second mob of rioters who were then inside the Capitol building broke through to the outside, forcing open the doors. Chambers and his friend described that when the mob from the inside broke through to the outside, Sobotka stated, "we just started pushing in" as Chambers nodded in agreement. Sobotka described that, "most people were just trying to take it, take a stand" and Chambers added, "[most people were just trying] to make a point." *See* Govt. Trial Exhibit 208.

In August 2022, Sobotka received a call from an FBI agent inquiring about his participation in the riot on January 6, 2021. Once Sobotka told him about the FBI investigation, Chambers advised Sobotka:

- "If they had criminal charges on you dawg they would have picked you up a year ago. But, the easy thing to do for them is to entrap people because so many people get fooled into believe they broke the law. YOU WERE LET INSIDE THE BUILDING BY CAPITOL POLICE. So, if I'm guilty, they guilty. Lol. Boom goes the dynamite . . ."

- "I do believe there's patriots inside the FBI that want to get to the truth. But you're going to need a politician to vouch for them! Haha"

- "To me. It sounds like someone from Holder has a buddy whose a Fed who told a Fed . . ."

- "If she's [the FBI agent] a Patriot, she'll show her hand. No matter what, 'you don't know what happened on the 6th and don't know anything about what happened on the 6th' until she shows her cards."

[Govt. Trial Ex. 533 and 532]

During trial, Chambers chose to take the stand and testify in his own defense. He testified falsely regarding multiple material facts. For instance,

- Chambers testified that he obtained permission from a police officer to enter the building, despite the video evidence showing he never spoke to police officers at the door and that officers were trying to get rioters out of the building and shut the doors to keep rioters from entering.

- Chambers identified U.S. Capitol Police Officer Marc Carrion as the officer who gave him permission to enter the building. But Officer Carrion testified at trial that he had not given any person permission to enter the building on January 6. Given their diametrically opposed testimony, video footage, and the jury's ultimate verdict, the jury clearly credited Officer Carrion's testimony and did not credit Chambers' testimony[2].

---

[2] Chambers' description of his conversation with officers also changed. First, Chambers said that he talked to the police officer on the left side of the East Rotunda Doors and then entered the building. ECF No. 47, Tr. Transcript Day 3 at p. 24-25. Chambers testified that the police officer told him that, "we're opening up the doors, we're allowing you guys in, my job is to make sure that the building doesn't get damaged, and that we understand that you guys have a First Amendment right." *Id*. at p. 25. Then Chambers testified that there was a police officer that

- Chambers testified he didn't see the "Area Closed" signs and fences that marked the restricted Capitol area despite the evidence showing that he walked by numerous "Area Closed" signs, bike fences, and snow fencing.

- Chambers testified that the east side of the Capitol building was peaceful and that there was no violence, despite video footage showing he was present when other rioters on the east side pushed into the building, ripped  away a riot shield from a police officer, and shouted aggressive chants such as "Send out the Traitors", "Push", and "Whose house, our house" in Chamber's presence.

[ECF No. 47, Tr. Transcript Day 3 at 14-15, 34, 39-40]

## III.    Statutory Penalties

Chambers now faces a sentencing for violating 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D); and 40 U.S.C. § 5104(e)(2)(G). For Counts One and Two, the maximum term of imprisonment is 12 months for this Class A Misdemeanor. 18 USC §§ 1752(a)(1) and (2). U.S.S.G. §5G1.1(a).   For Counts 3 and 4, the maximum term of imprisonment is six months for this Class B Misdemeanor. 40 USC §§ 5104(e)(2)(D) and (G).

## IV.    The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

---

spoke to a whole group of people, including him. *Id*. 40-41. Once confronted with evidence that Chambers entered on the right side, Chambers identified Officer Carrion as the officer he talked to at the door. *Id*. at 42.

In the PSR, the United States Probation Office calculated the offense level only for Count Two, the violation of 18 U.S.C. § 1752(a)(2), and not the offense level for Count One, the violation of 18 U.S.C. § 1752(a)(1). PSR ¶¶ 30-39. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1) - (3) are to be "repeat[ed]" for "each count." The offense level for Counts One and Two are as follows:

Count One: Violation of 18 U.S.C. § 1752(a)(1)

| Base Offense Level | 4 | U.S.S.G. §2B2.3 (Trespass) |
|---|---|---|
| Adjustment (Restricted Building or Grounds) | +2 | U.S.S.G. § 2B2.3(b)(1)(A)(vii): The trespass occurred "at any restricted building or grounds." On January 6, 2021, the U.S. Capitol was restricted because protectees of the United States Secret Service were present. *See* 18 U.S.C. § 1752(c)(1)(B). |
| Adjustment (Obstruction of Justice) | +2 | U.S.S.G. § 3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense."<br><br>Chambers testified falsely at trial regarding several material matters. He testified falsely at trial police officers gave him permission to enter the Capitol building during a violent riot, despite video evidence that Chambers didn't speak to police officers. He also testified falsely that the events of January 6 at the Capitol were peaceful, despite evidence that Chambers saw the rioters act violently towards police officers to get into the Capitol building. Finally, Chambers falsely testified that he didn't see the "Area Closed" signs at the perimeter of the restricted area around the Capitol building, despite photographic evidence that he walked past numerous "Area Closed" signs. |

Count Two: Violation of 18 U.S.C. § 1752(a)(2)

| Base Offense Level | 10 | U.S.S.G. §2A2.4 (Obstructing or impeding officers) |
|---|---|---|
| Adjustment (Obstruction of Justice) | +2 | U.S.S.G. § 3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense." |
| Total | 12 | |

The government agrees with Probation's calculation of the offense level for Count Two and with Probation's conclusion that Counts One and Two group because both involve the same victim, Congress. See U.S.S.G. § 3D1.2(a) and (b); PSR ¶ 30. The government further agrees with Probation that total offense level is 12. PSR ¶ 39. Chambers' convictions on Counts Three and Four are Class B misdemeanors to which the Sentencing Guidelines do not apply. 18 U.S.C. § 19; U.S.S.G. § 1B1.9; PSR ¶ 29.

The PSR identified four adult criminal convictions for Chambers. PSR ¶¶ 41-44. Those convictions generated a criminal history category of I. PSR at ¶ 47. Accordingly, Probation calculated Chambers' advisory Guidelines imprisonment range at 10 months to 16 months. PSR at ¶ 103.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and

fairness. Based upon a total offense level of 12 and a criminal history category of I, the guideline imprisonment range is 10 months to 16 months.

**V.      Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 13 months.

**A.  The Nature and Circumstances of the Offense**

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Chambers' participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Chambers, the absence of violent or destructive acts is not a mitigating factor. Had Chambers engaged in such conduct, he would have faced additional criminal charges.

One of the most aggravating aspects of this case was Chambers' repeated falsehoods during his trial testimony. Chambers testified at trial that he sought permission from Capitol police to enter the Capitol building – a statement refuted by voluminous evidence and a statement that a jury determined to be false. *See* ECF No. 47, Tr. Transcript Day 3 at 25-26. He testified that he didn't "recall seeing signage saying that the area was closed" and that he didn't "recall seeing any mesh snow fencing." *Id.* at 15.

Another deeply aggravating aspect of this case is Chambers' a lack of remorse. Shortly after the riot, Chambers encouraged his fellow rioter, Sobotka, to be uncooperative with the FBI, advising his friend to falsely tell the FBI, "you don't know what happened on the 6th and don't know anything about what happened on the 6th." [Govt. Trial Ex. 532].

Additionally, Chambers entered the Capitol building fully aware that rioters were attacking police and attempting to breach the Capitol building on multiple sides, as he observed violence and chaos on both the West and East fronts outside of the Capitol building. Chambers entered the Capitol building as part of a violent mob that overwhelmed the police and caused a major breach of the building. He joined other rioters in chanting inflammatory statements expressing his belief that his criminal conduct was justified.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of 13 months' incarceration in this matter.

### B. Chambers' History and Characteristics

Unlike many of his fellow rioters, Chambers was no stranger to the criminal justice system on January 6. As set forth in the PSR, in 2016, Chambers pleaded guilty to driving while intoxicated in violation of Virginia Code Section 18.2-266. *See* PSR ¶ 42. Chambers was sentenced to 180 days. The 180-day sentence was suspended, but the 180-sentence is counted as a prior sentence under U.S.S.G. § 4A1.1(c). *See* 4A1.2(a)(3) ("A conviction for which the imposition or execution of sentence was totally suspended or stayed shall be counted as a prior sentence under § § 4A1.1(c)."). *Id.* He is also awaiting disposition of a criminal charge that he committed alcohol-related driving offense in Fairfax County on May 9, 2024. *See* PSR ¶ 51. Furthermore, in his prior conviction in Dkt. No. GC16008780-00, Chambers violated the terms of Virginia Alcohol Safety Action Program on at least three occasions. *See* PSR ¶ 77.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence for this particular defendant also weighs heavily in favor of a term of incarceration.

First, as discussed above, although Chambers' has a criminal history category of I, he nevertheless has a history of prior arrests and convictions that reveal a clear pattern of disrespect for the law. *See* Section IX(B) *supra.* Chambers has consistently shown that those experiences with the criminal justice system did not deter Chambers from committing serious crimes on January 6. His lack of respect for the law was further demonstrated by his failure to express remorse for his crimes and his encouragement of Sobotka to falsely deny involvement if the riot if approached by law enforcement officials.

Chambers' false trial testimony showed that he was willing to be deceitful to get out of trouble. The Court must sentence Chambers in a manner sufficient to deter him specifically, and others generally, from going down that road again.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[3] This Court must sentence Chambers based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

---

[3] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

A jury found Chambers guilty of 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D); and 40 U.S.C. § 5104(e)(2)(G). The § 1752 offenses are Class A misdemeanors. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), apply.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct".  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v Russell Alford*, 21-CR-263-TSC, the defendant, like Chambers, was convicted following a jury trial of the same four offense as Chambers. Like Chambers, Alford walked past repeated and obvious signs that the Capitol building and grounds were restricted until he could find an unobstructed entrance into the Capitol building, entered the Capitol through a door that other rioters had broken open, and demonstrated a lack of candor and honesty during his trial testimony. Alford's conduct was in some measures worse than Chambers, insofar as Alford refused to leave the Capitol after police ordered him to do so and spread disinformation about the riot on social media. On the other hand, there was no evidence Alford encouraged another rioter to lie to investigators about their conduct on January 6.  Judge Chutkan sentenced Alford to 12 months of incarceration followed by 12 months of supervised release after he was convicted at trial of the same four charges as Chambers. Thus, a sentence here of 13 months of imprisonment is proper.

In *United States v. John Maron Nassif*, 1:21-cr-421-JDB, the defendant was convicted of the same four charges following a bench trial and the Court sentenced him to seven months of incarceration. Similar to Chambers, Nassif was not a violent participant in the riot, but was an active participant. Nassif chanted the same chant as Chambers, "Whose house, our house" as he was on Capitol grounds. Nassif, like Chambers, entered the Capitol building as he watched police officers attempting to push rioters out of the building. Chief Judge Bates sentenced Nassif to seven months' incarceration. Like Nassif, Chambers "could have taken a simple step to the left and left and gone, but he didn't. He made no attempt to do so." 1:21-cr-421-JDB, (April 27, 2023), Sent. Hrg. Tr. at 74. Judge Bates also determined that Nassif testified falsely. *Id*. Unlike Chambers, Nassif had zero criminal history points, which contributed to a sentence lower than the 13 months that is appropriate here.

In *United States v. Niemela*, 1:21-cr-623-CRC, the defendant, like Chambers, repeatedly walked past and ignored signs that the Capitol building, entered the Capitol through a door, other rioters had broken into while an alarm sounded, and celebrated her participation in the riot. Unlike Chambers, she refused police orders to vacate the Capitol building during the riot and she did not testify at trial. Judge Cooper sentenced Niemela to 11 months of incarceration.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI. Restitution

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with

discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Chambers was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors

21

as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[4]

Because Chambers engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and [his or her] criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold Chambers responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."). *cf*. 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Chambers to pay $500 in restitution for his

---

[4] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

convictions on Counts One-Four. This amount fairly reflects Chambers' role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, five hundred dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was convicted of only misdemeanors and not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

### VII.    Fine

Chambers' convictions for violations of 18 U.S.C. § 1752(a)(1) and (a)(2) and 40 U.S.C. § 5104(e)(2)(D) and (2)(G) subject him to a statutory maximum fine of $270,00. See 18 S.C. § 3571(b)(5) and (b)(6). In determining whether to impose a fine, the sentencing court should consider Chambers' income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on Chambers to show present and prospective inability to pay a fine. See *United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, Chambers has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $5,000 to $55,000. U.S.S.G. § 5E1.2(c); PSR ¶ 124.

Under § 5E1.2(d), courts shall consider:

(1)     The need for the combined sentence to reflect the seriousness of the offense (including the harm or loss to the victim and the gain to the defendant), to promote respect for the law, to provide just punishment and to afford adequate deterrence;

(2)     Any evidence presented as to the defendant's ability to pay the fine (including the ability to pay over a period of time) in light of his earning capacity and financial resources;

(3)     The burden that the fine places on the defendant and his dependents relative to alternative punishments;

(4)     Any restitution or reparation that the defendant has made or is obligated to make;

(5)     Any collateral consequences of conviction including civil obligations arising from the defendant's conduct;

(6)     Whether the defendant previously has been fined for a similar offense;

(7)     The expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed; and

(8) Any other pertinent equitable considerations.

U.S.S.G. § 5E1.2(d). See 18 U.S.C. § 3572(a).

Not only has Chambers made no effort to demonstrate he is unable to pay a fine, he has repeatedly ignored Probation's directives that he provide financial information to that office. PSR ¶¶ 94, 100. Because Chambers has not met his burden, this Court should impose a fine within the Guidelines range.

## VIII.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Chambers to 13 months' incarceration followed by twelve months' probation. The government also requests that this Court impose $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Chambers' liberty as a consequence of his behavior.

Respectfully submitted,

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
DC Bar No. 481052

By:    /s/ *Katherine E. Boyles*
Katherine E. Boyles
Assistant U.S. Attorney
D. Conn. Fed. Bar No. PHV20325
United States Attorney's Office
601 D Street NW
Washington, D.C. 20001
Phone: 203-931-5088
Email: Katherine.Boyles@usdoj.gov

/s/ *Taylor Fontan*
Taylor Fontan
Assistant U.S. Attorney
IN Bar No. 35690-53
United States Attorney's Office
601 D Street, N.W.
Washington, D.C. 20530
Taylor.fontan@usdoj.gov
202-815-8597